**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

JOSEPH A. JIAMPIETRO,                  :

               Plaintiff,        :        Case No. <u>1:18-cv-04769</u>

                 :

       against            :

BOARD OF GOVERNORS OF THE FEDERAL  :
RESERVE SYSTEM,

              Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT IN THE NATURE OF MANDAMUS TO THE BOARD OF GOVERNORS
OF THE FEDERAL RESERVE SYSTEM COMPELLING DEFENDANT TO ACT
PURSUANT TO 28 U.S.C. § 1361, 5 U.S.C. § 555(B) AND 12 C.F.R. § 263.40.**

FORD O'BRIEN LLP
575 Fifth Avenue
17th Floor
New York, NY 10017
(212) 858-0040

*Attorneys for Plaintiff*

May 30, 2018

## COMPLAINT FOR WRIT OF MANDAMUS

**To the Honorable Judges of Said Court:**

Plaintiff, **Joseph A. Jiampietro**, through undersigned counsel, alleges as follows:

## INTRODUCTION

Plaintiff, Joseph A. Jiampietro, by his undersigned counsel, hereby seeks mandamus relief compelling the Board of Governors of the Federal Reserve System (the "Reserve Board") to perform its nondiscretionary duty under 12 C.F.R. § 263.40 and 5 U.S.C. § 555(b) to take final agency action in the enforcement action captioned: *In the Matter of Joseph Jiampietro, individually, and as a former institution-affiliated party of Goldman Sachs & Co., New York, A Non-Bank Subsidiary of a Registered Bank Holding Company*, Docket Nos. 16-012-E-I; 16-012-CMP-I (the "Enforcement Action") by either dismissing the action, or entering a final order on Jiampietro's Emergency Interlocutory Appeal filed July 26, 2017, and never acted upon, and also on the Administrative Law Judge's (the "ALJ") November 30, 2017 Final Recommended Decision and Order incorporating in full the ALJ's June 5 Summary Disposition Order, so that Jiampietro can assert his right to appeal to the appropriate federal Court of Appeals.

## NATURE OF THE COMPLAINT

1.     Plaintiff Joseph Jiampietro, a former senior advisor to FDIC chairwoman Sheila Bair and former Managing Director at Goldman Sachs & Co. in its Financial Institutions Group with a twenty-year unblemished career, is the subject of an Enforcement Action by the Reserve Board that never should have been brought and cannot withstand appellate scrutiny. Indeed, Jiampietro never engaged in any wrongful conduct, as was demonstrated during the proceeding when the ALJ concluded that Jiampietro both acted with complete and total honesty at all times, engaged in *no personal dishonesty*, and obtained *no personal benefit*

from the alleged conduct. Nor did Jiampietro cause *any harm* to any insured depository institution. Notwithstanding the absence of a single fact ordinarily part of an enforcement proceeding worthy of the Reserve Board's time and resources, at the end of a proceeding so devoid of due process as to shock the conscience, the ALJ found Jiampietro engaged in a technical violation and recommended he be barred for life from the industry and assessed a significant civil money penalty. This was just the start of the due process violations, as after making this decision the ALJ actually ordered Jiampietro to take part in a "hearing" where Jiampietro was explicitly precluded from defending against any claim made against him in the complaint. When Jiampietro sought emergency interlocutory review, the Reserve Board ignored his motion – which remains outstanding today, some eleven months later.

    2.      Even putting aside the string of due process violations, any adverse findings from the ALJ and Board cannot withstand appellate scrutiny as (a) the underlying factual basis for the proceeding was discarded by the Reserve Board's enforcement counsel ("Enforcement Counsel") as unprovable after it requested that the agency not consider any testimony by its sole witness who was shown to have lied to Enforcement Counsel regarding the core allegations that underpinned the complaint, (b) the Reserve Board never authorized an enforcement proceeding based on the new allegations first asserted in Enforcement Counsel's motion for summary judgment (which Jiampietro was precluded from taking discovery on or defending against), (c) the proceedings held before the ALJ lacked even the most basic statutory and constitutional protections, and (d) the action itself was beyond the Reserve Board's statutory enforcement authority.

    3.      It appears to be a mix of Jiampietro's proven good faith and personal honesty combined with the staggering unfairness of the ALJ's decisions that has resulted in the

Reserve Board having abdicated its responsibility to issue a decision in this proceeding. Whether the Reserve Board is hesitant to act in the face of the indefensibility of the enforcement proceeding overseen by the ALJ, or has not acted for some other reason, the result is the same; another violation of Jiampietro's rights – the right to have this proceeding timely concluded as Congress requires. By neglecting to take final agency action, the Reserve Board has effectively trapped Jiampietro in an administrative purgatory. The ALJ has found a way to impose the sanction the Reserve Board sought – barring Jiampietro from the industry by way of a public recommended decision  – without subjecting it to appellate review that cannot withstand objective scrutiny.

4.      This Complaint in the Nature of Mandamus pursuant to 28 U.S.C. § 1361 respectfully asks the Court to order the Reserve Board to take final agency action regarding Jiampietro's case, either dismiss the matter (as the Reserve Board should), or issue a final decision so he may take his appeal.

5.      Under 12 C.F.R. § 263.40, the Reserve Board has a clear and non-discretionary obligation to file its final agency order 90 days after the record was duly submitted, which occurred on January 29, 2018, 122 days ago.  See §263.40 "The Board *shall* render a final decision within 90 days . . .) (emphasis added).  The Reserve Board also has a clear and non-discretionary obligation under 5 U.S.C. §555(b) to conclude the proceeding within a "reasonable time."  The "reasonable time" under the Board's own regulation is 90 days after the parties have submitted their final briefs. Here, the Reserve Board has failed under both statutory schemes, as the enforcement action has now been wrongfully prosecuted for nearly a year following the ALJ's determination of liability as to all claims and assessing the

maximum civil money penalty on Summary Disposition on June 5, 2017 (defined *infra*), Jiampietro has been wrongfully denied his right to final agency action within this time.

6.     The Notice of Intent ("NOI") alleged that Jiampietro orchestrated a widespread criminal conspiracy in which he instructed a colleague, Rohit Bansal, to steal documents from the Federal Reserve Bank of New York ("FRBNY") so that Jiampietro could knowingly and intentionally use them for personal financial gain, which he allegedly achieved through knowingly disseminating these materials to potential clients. These absurd allegations were supported solely by the statements of Rohit Bansal, with no corroborating documentary or testimonial evidence. (Ex. 1).

7.     But these critical allegations were explicitly abandoned by Enforcement Counsel after discovery, when Bansal's deposition testimony confirmed that many of his statements underpinning the core allegations in the NOI were demonstrably false, after which Enforcement Counsel disavowed any reliance on Bansal's testimony.

8.     After abandoning reliance on Bansal's false testimony, Enforcement Counsel requested that the ALJ's recommended decision *not* consider Bansal's deposition testimony or testimony of every witness they interviewed during the investigation who had provided exculpatory testimony on behalf of Jiampietro.

9.     Instead of terminating the enforcement action because they could not prove any of the NOI's allegations without Bansal's (or any other witnesses) statements, Enforcement Counsel chose to pursue a new theory of the case that all but excised Bansal (and the allegations in the NOI) in favor of a new theory of liability – one that was no longer premised on the assertion that Jiampietro directed Bansal to steal FRBNY documents or even knowingly or intentionally used such documents or information.  Jiampietro was unaware of this new and

novel legal and factual theory until receiving Enforcement Counsel's dispositive motion and had no opportunity to take discovery on these new allegations.

10.     The summary disposition (judgment) motion set forth a new theory whereby Jiampietro allegedly received documents from Goldman Sachs' client banks, in his capacity as an employee of Goldman Sachs, that contained "confidential supervisory information" or "csi," a term that is subject to various definitions across different federal agencies.[1] Jiampietro then allegedly "used" these documents, which concerned Goldman Sachs' client banks, in connection with advising those same clients, as they had requested.  Liability was principally premised on the assertion that Jiampietro did not have the appropriate regulatory permission to view Goldman Sachs' client banks' csi or to circulate it within Goldman Sachs in connection with its work for the clients that provided the documents to Goldman Sachs in the first place.

11.     In addition, having abandoned the allegations that Jiampietro directed Bansal's criminal conduct, or knew about it, as a secondary new ground for liability, Enforcement Counsel asserted for the first time in their motion for summary disposition that Jiampietro's failure to *detect* Bansal's misconduct (as opposed to a procurement of such misconduct) amounted to the same violation as originally pleaded, and demanded the same finding of a violation of regulations, breach of an employee's fiduciary duty, and an unsafe and unsound banking practice, and the same sanctions. Indeed, the ALJ ultimately found that Jiampietro's

---

[1] CSI is generally restricted from disclosure outside of banks or the Federal Reserve system, *except in specified circumstances, such as disclosure to lawyers, accountants, and other professionals with pre-authorization*. Federal regulations in effect at the time made clear that it was the banks who alone bore the responsibility of obtaining any necessary authorization before disclosing csi to its investment bankers, such as Goldman Sachs, and indeed the engagement letter the Goldman Sachs' client banks all signed acknowledged this.

failure to uncover his colleague's criminal conduct amounted to the exact substantive violations as if he knowingly directed the criminal scheme.

12.     The Reserve Board never authorized Enforcement Counsel to bring an enforcement proceeding against Jiampietro based on these new benign allegations first asserted on motion for summary disposition. The Reserve Board had only authorized an enforcement proceeding premised on the actual allegations asserted in the NOI that Jiampietro directed Bansal's criminal conduct, and knowingly and intentionally misused stolen csi for his personal gain, not that Jiampietro "should have" known Bansal was stealing documents from his prior employer to assist Bansal in several assignments that numerous Goldman Sachs employees had assigned him.

13.     Despite the factual, legal, and procedural/constitutional flaws with Enforcement Counsel's new theory of the case, on June 5, 2017, the presiding ALJ, Christopher McNeil, granted Enforcement Counsel's motion for summary disposition ruling that these new theories satisfied all elements for all three counts alleged in the NOI, and subjected Jiampietro to the maximum statutory penalty, as well as a lifetime industry bar.  In making his ruling on summary disposition, the ALJ expressed his mistaken understanding that he was able to make findings of disputed fact, and credibility determinations to support his summary judgment ruling. While Enforcement Counsel had requested that the ALJ not consider Bansal's statements when deciding its summary disposition motion, many of Bansal's false statements that were requested to be excised were repeated in Enforcement Counsel's expert's report, which included a factual narrative based on Bansal's statements.  The ALJ then relied – in large part – on the factual narrative of the expert report that was based on Bansal's false statements, when he made disputed findings of fact when ruling on summary disposition on June 5, 2017.

14.     In his decision, notwithstanding his ruling on all three claims asserted in the NOI in favor of Enforcement Counsel, the ALJ also *sua sponte* ordered the parties to take part in a "hearing."  Under the June 5 Order Regarding the Parties' Motions for Summary Disposition ("June 5 Summary Disposition Order"), Enforcement Counsel was permitted to proceed to a "hearing" to present the case that it alleged in the NOI, but precluded Jiampietro from introducing evidence or arguments or otherwise defending himself because he had already lost on all claims on summary disposition. The sole exception to the complete prohibition on Jiampietro's ability to defend himself at this "hearing" was that Jiampietro was allowed to present arguments in favor of mitigation for a civil money penalty less than the maximum amount the ALJ concluded was warranted in his decision.

15.     Because a ruling on summary disposition as to all claims and the maximum civil money penalty divested the ALJ of further authority to hold this mockery of a hearing on irrelevant facts, Jiampietro sought the Reserve Board's emergency intervention, by way of an interlocutory appeal duly filed on July 26, 2017. But the Reserve Board never ruled on this emergency interlocutory appeal.

16.     As discussed in detail below, the Reserve Board's neglect in ruling on Jiampietro's interlocutory appeal ultimately compelled him to waive his right to present his current financial statement as a mitigating factor so that the summary disposition decision could be finalized with the ALJ's final recommendations and certification of the record on November 30, 2017 ("November 30 Recommended Decision and Order").  The parties' filed their respective "exceptions" on January 29, 2018 ("Exceptions" in Reserve Board proceedings are effectively memorandum of law arguing to accept or reject the ALJ's findings and recommended decision).  The filing of Exceptions by both parties started the 90-day clock.

However, since then, the Reserve Board has not adhered to the requirements of its own regulations under 12 C.F.R. §263.40 and 5 U.S.C. §555(b) requiring it to issue a final decision within 90 days (i.e. by April 28, 2018).

17.     This Court has mandamus jurisdiction to compel the Reserve Board to fulfill the clear and non-discretionary duty owed to Jiampietro, specifically final agency action either dismissing the matter or a final order so that, if necessary, Jiampietro may seek appellate review.

18.     The Reserve Board's failure to act on the matters legitimately raised by Jiampietro has deprived the Federal Circuit Court of jurisdiction to review these flawed proceedings since July 2017, when Jiampietro first sought the Reserve Boards' intervention and received no response.

## PARTIES

19.     Plaintiff, Joseph Jiampietro, is a former employee of Goldman Sachs & Co., a non-bank subsidiary of a bank-holding company with offices at 200 West Street, New York, NY.

20.     The Board of Governors of the Federal Reserve System is the governing body of the Federal Reserve System.  The Reserve Board consists of seven members nominated by the President of the United States and confirmed by the Senate (currently the Board consists of only three members with four vacancies and no nominations outstanding). The Reserve Boards' responsibilities include regulation and supervision of the Federal Reserve System, including the power to issue orders of prohibition against specific institutions and certain institution-affiliated parties and to impose monetary sanctions pursuant to Section 8 of the Federal Deposit Insurance Act.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1361: "The district courts shall have original jurisdiction of any action in the nature of

mandamus to compel an officer or employee of the United States or any agency thereof to

perform a duty owed to the plaintiff."

22.     This Court also has subject matter jurisdiction over this matter pursuant to 28

U.S.C. § 1331 because Jiampietro's rights to relief arise under Title 5 of the United States Code

and Title 12 of the Code of Federal Regulations.

23.     Venue is appropriate in this District because all or most events at issue in the

enforcement action took place in this District and because the parties previously agreed that any

hearing in the enforcement action would take place in the Southern District of New York. The

ALJ also issued an order notifying the parties that New York was to be the location of the

hearing.  (Ex. 2).

## FACTUAL BACKGROUND

24.     The origin of this case is the criminal conduct and conviction of Rohit Bansal, a

former FRBNY employee – terminated from the FRBNY for habitual deceptive conduct and

falsifying documents – who just weeks after being hired by Goldman Sachs, enlisted a former

colleague still working at the FRBNY, Jason Gross, to steal certain documents (including some

that Bansal himself drafted) many, but not all, of which contained csi.  Bansal has described

what motivated his conduct in his sentencing memorandum that he provided to Magistrate

Judge Gorenstein: he engaged in the misconduct in order to impress his new employer and

complete tasks that were assigned to him by multiple supervisors who all assumed Bansal

9

would not violate the law in connection with doing his job. (Ex. 3).  As Bansal told his

sentencing judge, no one asked him, or was aware that he had stolen these documents.

25.     When Bansal's criminal conduct was first uncovered by Bansal's (and

Jiampietro's) supervisor, Scott Romanoff, Bansal admitted to the theft, but informed Romanoff

that he (Bansal) had acted alone on his own initiative and that nobody at Goldman Sachs,

including Jiampietro, had requested that Bansal steal documents from the FRBNY, nor was

Jiampietro aware that Bansal had stolen documents. Bansal made similar statements – that no

one requested him to steal any documents or knew about his theft –  to other individuals outside

of Goldman Sachs as well.

26.     Bansal plead guilty to one count of theft of government property and received a

$5,000 fine, 300 hours of community service for misappropriation of documents which the

sentencing Magistrate Judge (Hon. Gabriel W. Gorenstein, U.S.M.J.) described as "essentially

innocuous" documents that caused "no harm" to any institution. (Ex. 4).

27.     While (a) the U.S. Attorney's Office for the Southern District of New York, (b)

the U.S. Securities and Exchange Commission, (c) the New York State Department of

Financial Services, and (d) the Financial Industry Regulatory Authority (FINRA) all

investigated Jiampietro, none took any action against him after concluding their investigations.

28.     Nevertheless, on August 2, 2016, the Reserve Board issued its NOI to

permanently bar Jiampietro from his chosen industry and impose a civil penalty *seventy times*

the criminal fine imposed on Bansal, the individual who stole csi from the FRBNY.

29.     The NOI sought an order (1) "[p]ermanently barring [Jiampietro] from

participating in any manner in the conduct or the affairs of any institution specified in 12

U.S.C. § 1818(e)(7)(a), pursuant to section 8(e) of the Federal Deposit Insurance Act, as

amended (the "FDI Act"), 12 U.S.C. § 1818(e)"; and (2) "[a]ssessing a civil money penalty against [Jiampietro] pursuant to section 8(i) of the FDI Act, 12 U.S.C. § 1818(i), of $337,500."

30.     The NOI alleged three separate "Counts" against Jiampietro: Count I, Unsafe and Unsound Banking Practices; Count II, Violations of 12 C.F.R. § 261.22(e); and Count III, Breaches of Fiduciary Duty.

31.     The singular factual theory set forth in the NOI was that Jiampietro – contrary to the apparent findings of every other investigative agency – had directed and requested that Bansal steal csi from Bansal's former employer.

32.     The NOI focused on three specific core allegations: (1) that "Jiampietro asked Bansal to obtain the confidential ERM framework in client pitches"; (2) that Jiampietro "asked Bansal to obtain information regarding Bank A's expected CAMELS ratings . . ."; (3) and that "Bansal provided to [Jiampietro] CSI materials obtained from the Reserve Bank, including a 2013 MRM survey the Reserve Bank conducted of Bank A, and a 2013 stress testing survey the Reserve Bank conducted of Bank A." Finally, the NOI further made the general allegation that "on multiple other occasions, Jiampietro requested that Bansal obtain CSI ("the CSI materials") from [a] Reserve bank analyst."

33.     The NOI made no allegation concerning Goldman Sachs' receipt of documents containing csi from a client bank that Jiampietro distributed to others within Goldman Sachs for the purpose of advising that client, or that Jiampietro's failure to uncover Bansal's criminal conduct would form the basis of the counts in the NOI.

## PROCEDURAL HISTORY

34.     Since the Enforcement Action began in August 2016:

    a.  Jiampietro filed an unsuccessful motion to dismiss on the ground that Enforcement Counsel failed to plead in the NOI elements necessary to establish that he was an

"institution-affiliated party" subject to the Reserve Board's enforcement authority, but his argument has never been ruled on by the Reserve Board.

b. Enforcement Counsel moved for and obtained summary disposition based upon a factual theory of liability that was never approved by the Reserve Board and therefore not included in the NOI, and not disclosed to Jiampietro until the motion was filed.  The ALJ granted this motion, ruling that Enforcement Counsel had proved all the elements necessary to establish each of the three counts and was entitled to the statutory maximum civil money penalty.  The ALJ then ordered the parties to take part in a "hearing" where Jiampietro could not defend himself, with the limited exception of arguing "mitigating factors" to seek a possible reduction from the maximum civil money penalty.

c. The parties stipulated that no hearing was necessary and waived any such hearing, as Enforcement Counsel waived their right to present additional evidence not ruled on Summary Disposition, specifically the allegations made in the NOI, and both parties agreed to make written submissions regarding the mitigating factors. Notwithstanding the stipulations by the parties to streamline the case after the summary disposition, after reading Jiampietro's written submissions on the mitigating factors which highlighted the fatal flaws in the ALJ's summary disposition – specifically his making disputed findings of fact and credibility determinations, shortly thereafter, in July 2017, the ALJ ordered – *against the request of both parties* – that the parties conduct a new round of discovery in connection with a "hearing" where Enforcement Counsel could seek to prove the factual allegations of the NOI that were abandoned on summary disposition (and

despite Enforcement Counsel's stipulated intent not to seek to do so), but also ordered that Jiampietro would _not_ be permitted to present any evidence or any defense to any claim in the NOI at the "hearing" because liability had been already established on summary disposition.

d.  Jiampietro moved for interlocutory relief to vacate the ALJ's July 2017 Order which forced him to undergo a second round of discovery and attend a hearing in which he could not defend himself, but the Reserve Board never acted on the motion.

e.  Receiving no response after several months and multiple written requests seeking a decision, Jiampietro stipulated that he would forego his statutory right to introduce the singular mitigating factor of his most recent financial statement to support a reduction in the maximum civil penalty that the ALJ held was warranted, waived his "right" to a "hearing" solely on "mitigating factors," and Enforcement Counsel again agreed that they would not pursue the theories articulated in the NOI they had abandoned and expressly waived their right forever to seek to prove the allegations in the NOI. The parties thus asked the ALJ to submit his ruling on summary disposition to the Reserve Board for review. The ALJ did not.  Rather, the ALJ issued a new recommended decision which incorporated in full his June 5 Summary Disposition Order ruling in favor of enforcement counsel on all claims on summary disposition, but also made the incredible ruling that Jiampietro waived his "right" to a "hearing" and so the recommended decision could be made on both a summary judgment standard and a preponderance-of-the-evidence standard *as if the hearing occurred, but a hearing in which Jiampietro failed to*

13

*present any evidence other than his Answer*.  Of course Jiampietro never waived

his right to a full hearing on the substantive issues as they had all been decided on

summary disposition.  Rather, Jiampietro only waived a "hearing" that enabled

him to submit his most recent related financial statement in favor of mitigating the

maximum civil money penalty, as the stipulations plainly provide.  The ALJ's

decision, which concluded that this "waiver" permitted the ALJ not to consider any

evidence submitted in opposition to summary disposition – and he could write the

opinion as if the only defense introduced to the NOI was Jiampietro's Answer – is

plainly reversible.

f.  The parties filed their exceptions to the ALJ's final ruling on January 29, 2018.

The Exceptions filed by Jiampietro make clear that the enforcement action could

not withstand appellate scrutiny. For their part, Enforcement Counsel

acknowledged in their Exceptions that the proper standard is summary disposition,

not preponderance of the evidence as if a hearing occurred. In their exceptions,

Enforcement Counsel also abided by their waiver to not seek to prove any

allegations in the NOI. The Reserve Board again has failed to take any action on

the Exceptions and has taken no action.

35.   As of the date of this Petition:

a.  it has been 549 days since the ALJ denied Jiampietro's objection to the Reserve

Board's statutory authority to maintain the enforcement action;

b.  it has been 355 days since the ALJ ruled on summary disposition that Jiampietro

had committed acts that subject him to a lifetime bar from the banking industry

and exposed him to the maximum civil penalty and imposed such sanctions on him
"unless and until" the Reserve Board rejects his findings;

c.  it has been 304 days since Jiampietro filed an emergency appeal to the Reserve
Board asking that it review the June 5 Summary Disposition Order and therefore
protect Jiampietro from unconstitutional and needless and burdensome further
proceedings ordered without authority by the ALJ the following month; and

d.  it has been 122 days since the litigants filed their respective exceptions to the
ALJ's final recommended finding of fact and conclusion of law.

36.     It is unreasonable for Jiampietro to continue to be denied his right to have this
matter dismissed or to have final agency action that he can appeal. Until and unless the Reserve
Board acts on his July 26, 2017 Emergency Interlocutory Appeal and the November 30
Recommended Decision and Order, Jiampietro will continue to be deprived of the opportunity
to seek appellate review.

### *Jiampietro's Motion to Dismiss*

37.     Jiampietro also seeks mandamus relief because he has been, among other things,
precluded from demonstrating to a federal appeals court that the Reserve Board does not have
authority to bring this case against him based on the facts it alleged in the NOI.

38.     On October 27, 2016, shortly after the commencement of discovery, Jiampietro
filed a motion with the ALJ seeking dismissal of the case on the ground that the Reserve Board
lacked enforcement authority because the allegations in the NOI failed to establish that
Jiampietro was an "institution-affiliated party" under 12 U.S.C. §1818(u), which is necessary
for the Reserve Board to have authority to bring this action against Jiampietro.

39.     In the NOI, the Reserve Board premised its enforcement authority solely on the fact that Jiampietro was an employee of Goldman Sachs & Co., which is a non-bank subsidiary of a bank holding company.  But the Reserve Board's enforcement authority to issue industry bars and civil penalties under 12 U.S.C. §1818 only extended to "institution-affiliated part[ies]" under 12 U.S.C. §1818(u) ("IAPs").  His mere status as a Goldman Sachs employee does not qualify him as such.

40.     Because Jiampietro was not an employee of an "insured depository institution" or a "bank holding company," the Reserve Board's enforcement authority over Jiampietro is limited to cases regarding injury or the breach of a duty to an "insured depository institution" or a "bank holding company."  But the Reserve Board's case was premised on alleged conduct vis-à-vis Goldman Sachs, not one of Goldman Sachs' client banks who unarguably suffered no injury or breach of duty.

41.     Because Goldman Sachs itself is not an "insured depository institution" or a "bank holding company," the NOI alleged no injury or breach that invoked the Reserve Board's authority.

42.      On November 23, 2016, the ALJ denied the motion, accepting Enforcement Counsel's argument that the Reserve Board has implied *per se* authority over all employees of non-bank subsidiaries of bank holding companies, notwithstanding the actual language of the applicable statutes. The ALJ ruled that the actual statutory language did not matter for purposes of his analysis, and rather he would be guided by agency assertions made by Enforcement Counsel where it conflicted with the statutory language.

*Jiampietro Is Methodically Prevented from Obtaining Meaningful Discovery*

43.     Shortly after the NOI was issued in August 2016, the parties took part in an initial

conference during which the ALJ set a full discovery schedule, setting deadlines for Third

Party Production of Documents, Issuance and Return of Subpoenas, Fact and Hybrid

Fact/Expert Witness Depositions, and Expert Reports, with discovery closing February 24,

2017, dispositive motions due by May 1, 2017, motions *in limine* due June 29, 2017, and a

hearing date scheduled for July 25, 2017.

44.     Over the course of the following months, the ALJ refused to permit Jiampietro to

obtain meaningful discovery.

45.     For instance, under the Reserve Board's Local Rules Supplementing the Uniform

Rules, respondents in enforcement actions may only take depositions of witnesses that the

Reserve Board intends to call at trial. (12 C.F.R. §263.53).  However, on September 27, 2016,

the ALJ entered a scheduling order that required Jiampietro complete all depositions, including

depositions of experts, before Jiampietro was provided with Enforcement Counsel's witness list

or its expert (or expert report), thereby precluding Jiampietro from having an opportunity to

depose Enforcement Counsel's witnesses or expert in advance of the hearing. (Ex. 5).

46.     Jiampietro objected and sought an amendment to the scheduling order so that the

last dates for noticing and completing depositions would occur *after* Enforcement Counsel

identified its witnesses.  By order dated November 14, 2016, the ALJ denied the request,

finding that "no authority is presented in support of the request, and no cause has been shown

warranting the change sought."  (Ex. 6).  When Jiampietro sought to depose Enforcement

Counsel's witnesses, whose names he first heard of when they appeared on the witness list after

the close of discovery, the ALJ quashed the subpoenas as being "untimely" simply noting that the time to depose witnesses expired the month before witness lists were exchanged.  (Ex. 7).

47.     Jiampietro was also largely precluded from obtaining any discovery he sought, even for the critical witnesses that he believed would be called because Enforcement Counsel had taken their on-the-record testimony during their investigation.  But the ALJ quashed almost all of these deposition subpoenas, including those concerning two critical eyewitnesses to the allegations levied by Bansal that formed the basis of the NOI – Scott Romanoff (Jiampietro's and Bansal's supervisor at Goldman Sachs) and Phil Labbe (Bansal's other supervisor who was allegedly present during the relevant meetings) – as well as quashing his subpoenas for critical documents sought from various financial institutions alleged to have been involved in the purported scheme, because the documents sought "contained csi." (Ex. 8).  Jiampietro was only permitted to depose Bansal, whose deposition was conducted on December 15, 2016.

**Bansal's Deposition Alters the Course of the Enforcement Action**

48.     The allegations of the NOI that Jiampietro directed or requested Bansal to obtain csi from the Federal Reserve Bank were premised solely on statements made by Bansal. But during Bansal's deposition: Bansal contradicted his prior statements, he contradicted allegations contained in the NOI that were based on his prior statements, he refused to acknowledge past misrepresentations, and he made new and clearly demonstrably false statements throughout his deposition.

49.     In a particularly blatant episode, Bansal unwaveringly insisted that he "resigned" from his position at the FRBNY, when in fact he was indisputably terminated for lying on numerous occasions, falsifying documents, and then refusing to acknowledge that he had been caught lying and falsifying documents.

50.     During his deposition, Bansal also doubled down on his prior statements by alleging Jiampietro not only asked him to steal csi but did so in front of as many as five other Goldman Sachs employees who themselves also, according to Bansal, instructed Bansal to steal csi from the FRBNY.  If Bansal's testimony was true, his theft of csi from the FRBNY involved no fewer than five Goldman Sachs employees (including three Managing Directors and a Partner) who all knew about and directed him to engage in the theft, but four of these employees Enforcement Counsel decided not to prosecute and Goldman Sachs continues to employee with no adverse employment consequences.

51.     Every witness who testified during the investigative phase of the enforcement proceeding (without Jiampietro or counsel present) explicitly refuted Bansal's allegations. Indeed, all four witnesses who Enforcement Counsel took on-the-record testimony from testified that Jiampietro was not aware of Bansal's misconduct, and they were not aware of Jiampietro ever misusing or improperly possessing csi.

52.     Following Bansal's deposition, counsel for Jiampietro informed Enforcement Counsel that they believed Enforcement Counsel could not introduce Bansal's testimony consistent with their ethical obligations.

### *Enforcement Counsel Seeks Summary Disposition on Theories Not Authorized by the Reserve Board and Not Pleaded in the NOI*

53.     On April 7, 2017, after the close of discovery, Enforcement Counsel filed a 65-page motion seeking summary disposition and asking the ALJ to entirely disregard any statement or testimony from Bansal for purposes of the motion.

54.     Enforcement Counsel also asked the ALJ not to consider any testimony from any other witness they interviewed during their investigation – other than Jiampietro – including the witnesses who Enforcement Counsel had interviewed and refuted the allegations in the NOI.

19

Jiampietro had sought to depose these witnesses, but the ALJ quashed deposition subpoenas concluding they were not in possession of relevant information.

55.     Enforcement Counsel sought *summary disposition* not on the allegations in the NOI, but on a novel theory not previously alleged that was "[b]ased on Respondent's own admissions and documents he sent and received, and without reliance upon the testimony of Bansal or any other witness."

56.     Enforcement Counsel's new strategy abandoned the NOI's allegations and sought a finding of liability on a much narrower and different set of allegations: that Goldman Sachs' client banks provided Jiampietro – in his capacity as an employee of Goldman Sachs and with Goldman Sachs' full knowledge and approval – with documents that contained csi concerning such clients, and for which the client banks, despite their own contractual and statutory obligations, failed to obtain proper authorization from the Reserve Board before disclosing.

57.     Enforcement Counsel then alleged – for the first time in their motion for summary disposition – that Jiampietro "used" these documents when advising the very client banks that provided them to Goldman Sachs.  They also alleged that Jiampietro "disclosed" csi by openly sharing these documents with dozens of other team members within the Financial Institutions Group in Goldman Sachs under an engagement letter and non-disclosure agreement, but *never* outside Goldman Sachs and *never* for any other purpose than advising those client banks.

58.     Because this conduct was obviously benign, and did not result in harm to any institution, *or even any risk of harm*, Enforcement Counsel simply alleged that Goldman Sachs advising its client with client provided documents was a technical violation of the regulations because the client had not obtained proper authorization prior to sharing it – and that because Goldman Sachs ultimately entered into a voluntary Settlement Agreement with the New York

Department of Financial Services ("DFS") including a fine as a result Goldman Sachs' failure to implement compliance procedures sufficient to identify Bansal's criminal theft, as well as the company's failure to train its employees (including Jiampietro) on identifying and handling csi – Jiampietro had "caused" "harm" to Goldman Sachs.

59.     But Enforcement Counsel of course did not allege or present evidence that Jiampietro "caused" his former employer – Goldman Sachs – to enter a causally unrelated voluntary settlement agreement with DFS that he was *not* a party to, *nor even aware of when it was being entered into by Goldman Sachs and DFS*.  The ALJ, however, on summary disposition, concluded that the critical element of an 1818(e) violation, that the alleged conduct "caused harm" was satisfied by considering this fine imposed on Goldman Sachs that it agreed to as part of a voluntary settlement agreement acknowledging its own violations and having nothing to do with Jiampietro at all.

60.     Though Jiampietro did not request or review any of the documents that Enforcement Counsel originally alleged he requested Bansal to steal – Enforcement Counsel argued that the legal result should be the same as if he had requested, reviewed, and knowingly used them, because Jiampietro's failure to uncover Bansal's criminal behavior in and of itself satisfied all the elements of the three Counts in the NOI and warranted the same (or greater) penalty.

61.     In response to Enforcement Counsel's summary disposition motion, Jiampietro filed a 100-page opposition memorandum, citing to 80 exhibits of documents and transcripts. He contemporaneously filed his own affirmative 43-page motion for summary disposition, attaching 21 additional exhibits. Between the two filings every single factual allegation raised in the NOI and the summary disposition motion was challenged and contradicted with

documentary or testimonial evidence, demonstrating, at the very least, a material dispute of every relevant fact.[2]

62.    Jiampietro argued, among other things: (1) that Bansal's allegations that Jiampietro requested him to obtain csi were demonstrably false and Jiampietro never knowingly or intentionally misused csi obtained from a client bank, Bansal, or anyone else and (2) that Jiampietro's receipt of documents from client banks could not form the basis of a prohibition order and devastating civil money penalty because it was not a violation of any regulation and was fully known about and approved by Goldman Sachs, that had outside and inside counsel advise that the statute clearly requires the client bank to obtain any necessary approval before sharing documents with Goldman Sachs.

63.    Indeed, Jiampietro identified close to one-hundred other individuals within Goldman Sachs and client banks, who, like him, understood that the contract between the client banks and Goldman Sachs as well as 12 C.F.R. § 261.20, did not place any affirmative obligation on Goldman Sachs' employees, or Goldman Sachs, to obtain authorization before a client bank shared csi with Goldman Sachs, and were otherwise unaware that there was anything improper about using client provided documents to advise that same client with their own documents.

---

[2] Because Jiampietro was denied the opportunity to take depositions of critical witnesses, in opposing summary disposition, he was forced to rely on Enforcement Counsel's interviews of several witnesses that were conducted under oath, but before the NOI, so Jiampietro was not represented and had no right to cross-examination. While Jiampietro cited to this testimony to the extent it was helpful, the testimony should not be considered against Jiampietro because he did not have any opportunity to examine these witnesses so as to give them the opportunity to expand and clarify their testimony that exculpated Jiampietro from all allegations.

***The ALJ Enters an Order on Summary Disposition Establishing Jiampietro's Liability on a Theory Not Authorized by the Reserve Board and Not Asserted in the Notice of Intent***

64.     While the summary disposition motions were pending, and just four days *after* the parties submitted their pre-hearing submissions including hundreds of contested exhibits, on June 5, 2017, twenty-four days before any motions *in limine* were due to challenge the expert report Enforcement Counsel had proffered in its summary disposition motion, the ALJ issued his June 5 Summary Disposition Order granting Enforcement Counsel's motion for summary disposition as to all three claims asserted in the NOI – but on the new theory of liability not included in the NOI. In his ruling, the ALJ expressly stated that he was not making any findings regarding the core factual allegations made in the NOI that Jiampietro instructed or requested Bansal to steal csi, or knew about Bansal's conduct. He also found Jiampietro could receive the maximum statutory civil money penalty.

65.     In ruling against Jiampietro on all claims on summary disposition, the ALJ purported to adhere to Enforcement Counsel's request not to consider the on-the-record testimony of Bansal or any other witness who provided exculpatory testimony on behalf of Jiampietro. This change in theory and excising of some evidence on summary disposition resulted in bizarre and unsubstantiated findings. Even though the decision was on summary disposition, the ALJ made disputed findings of fact and credibility determinations. He concluded that although there was no evidence that Jiampietro requested Bansal steal certain information (the "Enterprise Risk Management" or "ERM" materials) from the FRBNY to put in client presentations, there was evidence that Bansal did in fact include stolen information in three of the 150 pages of the presentation, and Jiampietro should have noticed this stolen information was surreptitiously included because he "flipped through" the presentation.  The ALJ further concluded that Jiampietro's failure to uncover Bansal's inclusion of this

information in the slide decks constituted a knowing disclosure of csi at these presentations *by Jiampietro* – even where all the information included publically sourced citations to make it appear to Jiampietro and everyone else that the information was public, and Jiampietro (1) was not physically present at those presentations, (2) had never seen the presentation slide deck, (3) the topic was not even discussed at the presentation, and (4) Jiampietro, nor anyone else at Goldman Sachs or any client bank ever learned any csi was ever included in the presentation, or disclosed.

66.     While the summary disposition decision focused almost exclusively on client-provided csi, there was *one* example of non-client-provided csi that Bansal brought to Goldman Sachs that the ALJ included in his decision and that was included in the NOI.  Specifically, the ALJ also based his summary disposition ruling on a finding that when Bansal disclosed Jiampietro's client's "management rating" (or "M rating," which is csi) and Jiampietro immediately escalated this information to three of his supervisors, including Scott Romanoff, that the act of reporting his receipt of this information to his superiors – as obligated to do under his employment agreement – constituted an improper disclosure of csi, which violated the law, was a breach of fiduciary duty, and constituted an unsafe and unsound banking practice.

67.     Notably, in coming to this decision, the ALJ relied heavily on the investigative interview transcript of Scott Romanoff, (citing to over 19 of his statements that were made without Jiampietro present or able to cross examine), although he ignored Romanoff's explicit testimony regarding the "M rating" in which Romanoff testified that Jiampietro's disclosure of the "M rating" to him, as his supervisor, was consistent with Goldman Sachs' policies and procedures.  This is the same Scott Romanoff whom the ALJ precluded Jiampietro from

deposing during discovery, by ruling that Romanoff was not in possession of any relevant information.

68.     This mid-litigation change in theory without providing adequate notice to Jiampietro renders the entire proceeding below constitutionally infirm. *See, e.g.,* (*Rodale Press, Inc. v. F.T.C.*, 407 F.2d 1252, 1256 (D.C. Cir. 1968) ("Hence it is well settled that an agency may not change theories in midstream without giving respondents reasonable notice of the change."); *N.L.R.B. v. Local Union No. 25, Int'l Bhd. Of Elec. Workers*, 586 F.2d 959, 961 (2d Cir. 1978) (agency may not base decision on issue "not raised in the amended complaint").

***Sua Sponte, the ALJ Orders Repeat Discovery on <u>All</u> Issues – Including the Theories of Liability that Had Already Been the Subject of Discovery and Abandoned by the Board Pursuant to a Stipulation – and Orders a Hearing – But One Where Jiampietro Is Precluded from Defending Against any Claims***

69.     In order to bring the case to a conclusion at the agency level, Jiampietro and Enforcement Counsel stipulated that there need not be another "hearing" or more discovery and agreed that the only remaining issue in the case following the June 5 Summary Disposition Order was the question of whether any mitigating factors counseled in favor of the Reserve Board imposing a civil money penalty less than the maximum amount the ALJ concluded was warranted.  All parties agreed that this issue could be presented to the ALJ by written submission based on the existing record, without the need for a hearing, with the exception that Jiampietro believed he had a right to submit a recent financial statement to demonstrate an inability to pay, which is a key factor in setting the penalty amount.  (Ex. 9).

70.     After considering the submissions, the ALJ would be in a position to file a final recommendation for the Reserve Board to consider.  On June 13, 2017, the ALJ issued an order vacating the hearing and setting a briefing schedule on the issue of mitigating factors and Jiampietro's motion to include his most recent financial statement. *Id.*

71.      One month later, on July 13, 2017, after reading Jiampietro's submissions regarding mitigation of the penalty which included arguments that the proceeding would not withstand agency or appellate review, and a motion he made to introduce his most recent financial statement so that the ALJ could take into account his most recent financial condition as he is statutorily obligated to do, the ALJ *sua sponte* entered an order that held that while the June 5 Summary Disposition Order had established that he would recommend Jiampietro be barred from the industry and subject to the maximum civil money penalty, the order did not constitute summary disposition, because it did not resolve all disputed "facts" or "issues" nor decide alternative theories of liability. (Ex. 10).

72.      Notwithstanding that (1) the parties stipulated that neither wanted to take part in a "hearing" after all claims were resolved on summary disposition, (2) Enforcement Counsel waived their right to present additional evidence or arguments on the factual allegations not resolved in the June 5 Summary Disposition Order, and (3) the ALJ so-ordered this stipulation, the July 13 Order declined to decide whether the factors justified mitigation, and instead set a "hearing" to commence on April 10, 2018, during which Enforcement Counsel would have the right to present evidence on any alternative theories of liability and factual assertions it wished to explore, but precluded Jiampietro from presenting any defense at this hearing.

73.      Jiampietro gave up significant constitutional rights by entering into the June 13 stipulation that he had entered into with Enforcement Counsel and changed his litigation strategy accordingly. The ALJ's *sua sponte* decision to vacate the parties' fully executed and filed stipulation waiving any further hearing after reading Jiampietro's briefs violated Jiampietro's most basic rights. Like the June 5 Summary Disposition Order, the new order set forth a full new round of discovery on the exact issues discovery was already taken on, as if the

case had commenced anew, and permitted Enforcement Counsel to make another motion for summary disposition on the exact allegations it already voluntarily stipulated it would no longer pursue.

74.     Jiampietro was then ordered to take part in a "hearing" that explicitly precluded him from defending himself as to liability on the claims in the NOI or the maximum civil money penalty, as he had already lost on all claims on summary disposition, an order that was and remains in full force and effect.

75.     The ALJ lacked authority to order such discovery and a hearing after ruling against Jiampietro on all claims on summary disposition. *See*, e.g. 5 U.S.C. § 554(b)(3); 12 C.F.R. § 263.29(c); 12 U.S.C. § 1818(i)(2)(H); 12 C.F.R § 263.35; 12 C.F.R. § 263.29(d); 12 C.F.R. § 263.5; 5 U.S.C. § 556(d); 12 C.F.R. § 263.30; FRE 401; FRE 402; 12 C.F.R. § 263.36.

76.     Accordingly, the ALJ was required to transmit the matter to the Reserve Board at that time, and Plaintiff was entitled to a final decision 90 days after any exceptions were filed, which should have occurred almost twelve months ago, last summer.

***Jiampietro Seeks Interlocutory Review – He Receives No Response***

77.     On July 26, 2017, Plaintiff timely filed a request to the Reserve Board for emergency interlocutory review of the July 13 Order, seeking, among other things, (1) an immediate, emergency stay, (2) an order requiring the ALJ to submit his June 5 Summary Disposition Order for review, and (3) an order vacating the July 13 Order.

78.     The Reserve Board took no action.

79.     In the following months, Enforcement Counsel accepted the invitation to recommence discovery, and focused on Jiampietro's financial condition, by, among other things, issuing subpoenas to members of his immediate family.  During this phase of discovery,

Enforcement Counsel insisted on deposing Jiampietro's 75-year old father, and demanded bank account information of his teenage daughter, as well as from his counsel.

80.     Suffering under the significant burden of repeat discovery where in this case liability and sanctions were already determined and could not be defended against, and having heard no response to his interlocutory appeal, Jiampietro waived his right to assert the mitigating factor of his current financial statement to lower the recommended civil money penalty, and agreed to rely solely on the prior his prior submissions arguing in favor of mitigation. (Ex. 11).

81.     Given his clear statutory rights, Jiampietro asked the ALJ to accept a copy of his financial statements so that at least his ability to pay would be considered in connection with the penalty amount.

82.     On October 6, 2017, the ALJ entered a further "scheduling order" holding that Jiampietro's argument that the Reserve Board must consider his financial condition prior to imposing any civil money penalty under 12 U.S.C. 1818(i)(2)(G) (providing that the Board must consider a respondent's financial condition prior to imposing a civil money penalty) vitiated any agreement with Enforcement Counsel (although Enforcement Counsel never made this argument) and *again* reopened plenary discovery as to all allegations in the NOI, ordering the parties to take part in a hearing on the factual allegations asserted in the NOI that had been waived on April 10, 2018 (but again, a hearing in which Jiampietro would not be permitted to introduce evidence or defend against any claim or the imposition of the full second-tier penalty amount).  (Ex. 12).

83.     As a result of this clear violation of his statutory and constitutional rights, but with no opportunity to seek agency review, Jiampietro then entered into a third

stipulation/waiver with Enforcement Counsel whereby Jiampietro waived the right to present even his current financial statement as a mitigating factor, and Enforcement Counsel again waived its right to assert theories of liability not presented in the summary disposition motion and alleged in the NOI.  (Ex. 11, 13).  With that stipulation drafted by Enforcement Counsel, Jiampietro was led to believe that the ALJ would set the civil money penalty amount, without considering Jiampietro's most recent financial statement, and then send the recommended decision to the Reserve Board for final agency action.

***The ALJ Issues a Final Recommendation and the Litigants File Their Exceptions***

84.     On November 30, 2017, the ALJ issued his final November 30 Recommended Decision and Order to the Reserve Board that Jiampietro be barred from the industry and subject to a $337,000 civil penalty. (Ex. 14).

85.     In his recommendation, the ALJ incorporated in full his June 5 Summary Disposition Order and articulated the same basis for liability as he did in that Order, and again found that the Reserve Board had enforcement authority based solely on Jiampietro's employment by Goldman Sachs.  (Ex.15).

86.     However, the ALJ also held that the effect of Jiampietro's October 2017 post-summary disposition waiver of his right to introduce his most recent financial statement meant that all issues already decided on a summary disposition standard of proof in the June 5 Summary Disposition Order (the same as Fed. R. Civ. P. 56), could now also be re-decided on a preponderance of the evidence standard as if a hearing occurred where Jiampietro presented no evidence, and relied solely on the statements in his answer to the NOI.

87.     The ALJ changed the standard of proof to a hearing standard notwithstanding the fact that none of his orders permitted Jiampietro to challenge the ALJ's previous finding of

liability on summary disposition in a hearing and that summary disposition was fully decided as to all claims on June 5, 2017, and that at no point did Jiampietro ever knowingly or voluntarily waive any right, other than his right to present his most recent financial statement as a mitigating factor to lower the maximum civil money penalty.

88.     On November 30, 2017, the ALJ also transmitted the record to the Reserve Board.

89.     On January 29, 2018, the litigants filed their respective exceptions to the ALJ's recommended decision thereby closing the record and starting the 90-day clock for the Reserve Board to take final agency action.

90.     As of the filing of the Petition in this matter, the Reserve Board has taken no action.

91.     Since the record was closed, Enforcement Counsel has filed two motions seeking agency decision.  The Reserve Board has failed to act on Enforcement Counsel's motions as well.

92.     While the Reserve Board has taken no action in this case, the agency has been working on other matters for the past 122 days. The Reserve Board website indicates that it has started, concluded, or took action in 60 other enforcement actions since the record here was closed and submitted for final agency action.

93.     There is reason to believe that unless mandamus is granted here the Reserve Board will continue its inaction in this case, while leaving Jiampietro indefinitely to suffer the effects of the publicized Summary Disposition Order by the ALJ that effectively imposed an industry bar.

## FIRST CAUSE OF ACTION

**(Mandamus to Compel the Reserve Board to Exercise its Duties to Render a Final Decision as required by 12 C.F.R. § 263.40)**

94.     Plaintiff repeats and realleges the allegations in Paragraphs 1-93 as though fully set-forth herein.

95.     On June 5, 2017, the ALJ issued an order resolving all claims on summary disposition in favor of Enforcement Counsel, specifically finding that Enforcement Counsel had proven each and every element for each count in the NOI and further that Enforcement Counsel was entitled to the maximum civil penalty sought in the NOI.

96.     On November 30, 2017, the ALJ transmitted the matter along with his recommended decision and the record to the Reserve Board for final decision.

97.     On January 30, 2018, the litigants filed their exceptions to the ALJ's recommendations.

98.     12 C.F.R. § 263.40 imposes a clear non-discretionary duty on the Reserve Board to issue a final decision 90 days after that parties have been notified that the matter has been submitted to the Reserve Board for final decision, which occurred when the exceptions were filed on January 29, 2018.

99.     Despite the clear, non-discretionary statutory duty under 12 C.F.R. § 263.40, the Reserve Board has failed to issue a final decision within 90 days. The Reserve Board was required to issue a final decision on April 28, 2018.

100.     Plaintiff exhausted all available administrative remedies prior to seeking this Complaint in the nature of a writ of mandamus, and exhaustion is otherwise excused.

101.     Plaintiff is therefore entitled to a writ of mandamus ordering the Reserve Board to issue a final decision.

## SECOND CAUSE OF ACTION

**(Mandamus to Compel the Reserve Board to Conclude the Case Within "a Reasonable Time" as required by 5 U.S.C. § 555(b))**

102.   Plaintiff repeats and realleges the allegations in Paragraphs 1-101 as though fully set-forth herein.

103.   5 U.S.C. § 555(b) mandates that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."

104.   The Enforcement Action has not concluded within a reasonable time as required by 5 U.S.C. § 555(b).

105.   Plaintiff exhausted all available administrative remedies prior to seeking this Complaint in the nature of a writ of mandamus, and exhaustion is otherwise excused.

106.   Plaintiff is therefore entitled to a writ of mandamus ordering the Reserve Board to issue a final decision.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joseph Jiampietro respectfully prays that the Court enter an order:

a.   Granting Plaintiff, a writ of mandamus and an order compelling the Reserve Board to dismiss the Enforcement Action or issue a final and appealable decision on Jiampietro's July 26, 2017 Emergency Interlocutory Appeal and on the November 30, 2017 Recommended Decision and Order pursuant to its non-discretionary duty to do so as set forth in 12 C.F.R. § 263.40; and/or

b.   A writ of mandamus from this Court compelling the Reserve Board to dismiss the Enforcement Action or issue a final and appealable decision on Jiampietro's July 26, 2017 Emergency Interlocutory Appeal and on the November 30, 2017 Recommended

Decision and Order pursuant to its non-discretionary duty to conclude the case within a

reasonable time as set forth in 5 U.S.C. §555 (b); and

c.  Granting such other and further relief at law and in equity as justice may require as it

deems just and proper.

d.  It is further requested that the Court retain jurisdiction over this matter to ensure the

Reserve Boards' timely compliance with this Court's order.


Dated:   New York, New York
          May 30, 2018

                                    FORD O'BRIEN LLP

                                    _____
                                    Adam C. Ford
                                    Kevin O'Brien
                                    575 Fifth Avenue
                                    17th Floor
                                    New York, NY 10017
                                    aford@fordobrien.com
                                    (212) 858-0040

                                    *Attorneys for Plaintiff Joseph A. Jiampietro*